UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 5:21-MJ-5145-MAS |
| v. ) | |
| ) | |
| STEPHEN CHASE RANDOLPH, ) | |
| ) | |
| Defendant. ) | |

## **DETENTION ORDER**

This case presents the question of whether the Bail Reform Act mandates detention where a defendant, with a mostly law-abiding past, engages in an egregious, injurious, and felonious assault on a federal law enforcement officer as part of a broader effort to disrupt the democratic process of the United States government.  The Court holds that it does.

**I.     FACTUAL BACKGROUND**

In the early morning hours of January 6, 2021,[1] Defendant Stephen Chase Randolph ("Randolph") departed his home in Harrodsburg, Kentucky, and headed to the "Stop the Steal" rally in Washington, D.C., to hear then-President Donald Trump speak.  As was widely reported in real-time on nearly every American news outlet that afternoon, many in the crowd from the "Stop the Steal" rally advanced towards the Capitol building just before 1:00 p.m. Eastern Time.  Videos designated Government's Exhibit 1A (the "YouTube video")[2] and 2A  (the "Instagram

---

[1] The testimony was slightly conflicting on whether Randolph set out on his trip in the late evening hours of January 5th or the early morning hours of January 6th.  This factual discrepancy is unimportant to the Court's analysis.
[2] This video is also publicly available at https://youtu.be/DHessyWYXqM.

video")[3] show a very large crowd approaching the Capitol building, where there were United States Capitol Police officers standing guard behind makeshift metal barriers constructed from bike racks.[4] [Ex. 1A at 4:55]. The officers were in uniform, but were not wearing helmets or "riot gear" of any sort. Randolph, wearing a black jacket and gray taboggan with the word "Carhart", can be seen advancing towards the front of the crowd. He placed himself against the metal barrier, directly facing a Capitol Police Officer (referred to in the Record as "Victim" and herein as "Victim Officer"). Randolph later admitted to FBI agents that he is the individual on the videos in the black jacket and gray Carhart taboggan.

What happened next shocks the conscious. Initially Randolph, and immediately then others, can be seen engaging with the Victim Officer by shaking and rocking the metal barrier. She appears to attempt to wrestle it away from him. In seconds, Randolph gained control of the metal barrier and used it to shove the Victim Officer backwards, breaching the barricade. [DE 1A at 5:11-22]. The Victim Officer careened backwards as Randolph continued to shove the metal barrier against her, until the barrier became lodged against the handrail of the stairs that were several feet behind where the altercation began. At this same time, the Victim Officer fell backwards as Randolph pushed her with the metal barrier. It appears that she hit her head on the metal stair handrail and collapsed. Several other protesters—including one individual who had been pushing against the barrier with Randolph—can be seen hurriedly coming to the Victim Officer's assistance. Randolph, however, appears to ignore the Victim Officer in an unconscious heap on the ground. Rather, he jumped over the metal barrier, turned to his left, and began a

---

[3] This video is also publicly available at https://www.instagram.com/p/CJugaFfnFD7.
[4] These videos have different start times, end times, and durations, and were filmed from two different angles. However, both videos show the entirety of the events that resulted in the charges against Randolph.

2

second physical altercation with three additional Capitol police officers. The second altercation continued until the officers were able to shove Randolph over the then splayed barriers on the ground. [DE 1A at 5:22-47].

Three months later undercover FBI agents visited Randolph at his workplace and engaged him in a conversation about the events of January 6, 2021. This conversation was memorialized as follows in the Statement of Facts attached to the Complaint:

> RANDOLPH said he attended the former President's speech but left early after hearing people would be going to the U.S. Capitol. RANDOLPH said that upon arriving at the area of the U.S. Capitol, there were steel barriers set up in front of a grassy area in front of the U.S. Capitol building and there were approximately 15 police officers spread out in this particular area. RANDOLPH said he was in this area for approximately 5 minutes before "shit went crazy" and that he was standing close to people who were throwing items at the police. RANDOLPH further stated "**I was in it**," and "**It was fucking fun**" referring to being in the crowd at the U.S. Capitol. RANDOLPH said he witnesses a female police officer get pushed over by barricades and that her head had bounced off the handrails by the stairs. RANDOLPH opined that the female police officer likely had a concussion because she was curled up in the fetal position after being pushed to the ground.

[Statement of Facts in Support of Complaint, DE 1 (emphasis added)]. United States' witness FBI Special Agent Kacy Jones testified to these same facts at the detention hearing. [DE 8]. Agent Jones further testified that law enforcement conducted a search of Randolph's residence in April 2021, where they located the same black jacket and Carhart taboggan Randolph is wearing in the YouTube and Instagram videos. Agent Jones also stated that the FBI interviewed Randolph on April 20, 2021, and he told them that he had traveled to Washington, D.C., alone on January 6, 2021, to see President Trump speak. Randolph told the FBI during the interview that after the encounter caught on the YouTube and Instagram videos, "that he did walk closer to the U.S. Capitol building but that he did not go inside." [DE 6, Recording at 27:50-58]. It was during this interview that Randolph admitted to agents that he was the individual in the black jacket and gray Carhart hat.

3

## II.     PROCEDURAL BACKGROUND AND LEGAL STANDARD

The Court conducted a detention hearing in this matter on April 23, 2021. [*See* DE 6]. The Court previously found that the United States had a right to the hearing under 18 U.S.C. § 3142(f)(1)(A), (f)(2)(A) and (f)(2)(B). [*See* DE 4].

Detention, based on danger, must rest on facts supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A flight-based (or, more accurately, nonappearance-based) detention decision must rest on facts supported by a preponderance of the evidence. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). The analyses are distinct, and conditions that could adequately address flight will not necessarily mitigate danger to a sufficient degree. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir. 2001). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with conditions imposed. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as critical release component). In the end, any detention decision ultimately turns on the efficacy of potential conditions, which in turn hinges substantially on predicted compliance by a defendant. *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting "critical flaw" in set of proposed, strict release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *Id.* at 1093 n.13 (stating that any set of conditions except a "'replica detention facilit[y]'" necessarily would "hinge on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is evidentiary reliability and accuracy. *See*, *e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and ultimate weight in the detention

4

calculus. The § 3142(g) factors drive the analysis. These factors apply to flight and danger-based detention decisions; however, as explained below, the United States offered little evidence of Randolph's risk of flight and no evidence that he will obstruct justice. Thus, after a brief discussion of the risks that Randolph will obstruct justice or flee, the Court will analyze the § 3142(g) factors in depth as related primarily to danger.

## ANALYSIS

The United States moved for detention on the basis of danger (18 U.S.C. § 3142(f)(1)(A)), flight risk (18 U.S.C. § 3142(f)(2)(A)), and obstruction of justice (18 U.S.C. § 3142(f)(2)(B)). The Court will address each, albeit in reverse order.

A. **OBSTRUCTION OF JUSTICE**

The United States moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(B) because Randolph is charged with an obstruction of justice offense. The Bail Reform Act requires the Court to hold a detention hearing in a case that involves "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Although Randolph is charged with an obstruction offense, the United States presented no evidence at the hearing that there is any risk—much less a "serious risk"—that Randolph will obstruct justice or "threaten, injure, or intimidate" a witness or juror during the pendency of this case. "[T]he Court will not assume that just because [a defendant] has been charged with … obstruction of justice, he is likely to commit these same offenses again during the course of these proceedings. Indulging such an assumption would be tantamount to creating a per se rule of detention in cases involving witness tampering and obstruction." *United States v. Demmler*, 523 F. Supp. 2d 677, 683 (S.D. Ohio 2007). The Court finds the United States presented no evidence whatsoever that Randolph will engage in obstruction of justice if released, and therefore declines to detain him on this basis.

**B.     RISK OF FLIGHT**

The United States argued that all four Bail Reform Act § 3142(g) factors weigh in favor of flight-based detention, though ultimately did concede that the "weight of the evidence that he would flee is not strong." [DE 6, Recording at 1:36:01-12]. The United States noted that the evidence against Randolph is strong and a conviction is likely. Two of the charges carry penalties of up to twenty years imprisonment, which the government argued increases Randolph's motivation to flee. *United States v. Perez*, 2017 WL 1457949 at *6 (9th Cir. April 25, 2017) (considering significantly long prison sentences as a factor that "weighs heavily in favor of detention"). Finally, the United States suggestsed that Randolph does not have strong ties to the Eastern District of Kentucky (where he would be released) because he could easily obtain a similar convenience store job elsewhere, he does not own property here, and he has no close family of his own here.

The Court finds that despite these facts, the United States did not prove by a preponderance of the evidence that Randolph poses a risk of flight. Randolph has lived in Kentucky nearly his entire life. [Pretrial Services Report at 1-2]. More importantly, his girlfriend of seven years, her father, and her mother all testified on Randolph's behalf at the hearing. All three witnesses expressed their willingness to support Randolph during the pendency of this case. The testimony was particularly moving because his girlfriend's parents both stated that they did not agree with Randolph's political viewpoints, but, regardless, expressed true affection and loyalty to Randolph. His girlfriend's father, a lawyer and ordained minister, testified that Randolph would be permitted to continue to live on their property, and he would pay Randolph to fix up the property. This very genuine outpouring of support suggests Randolph would have little incentive to flee. Additionally, Randolph has no financial resources with which to flee, no passport, and no ties outside of the Commonwealth. [Pretrial Services Report at 2-3].

In the end, the United States did not prove by preponderance of the evidence that Randolph poses a risk of flight or nonappearance; further, if the Court were to release Randolph, it would impose conditions that would add a layer of additional assurance that he would appear at future court hearings.

**C.     RISK OF DANGER**

Although Randolph's detention hearing occurred in the Eastern District of Kentucky, sitting in the Sixth Circuit, the undersigned relies heavily on the analysis of courts across the country that have already addressed the risk of danger posed by individuals involved in the January 6th insurrection.  The unique circumstances of the crimes alleged, the number of others across the country, and the D.C. District Court's interest in prosecuting these cases requires significant consideration of the rapidly developing case law on these issues in the that district.  In particular, this court gives substantial weight to the D.C. Circuit court's decision *United States v. Munchel*, 991 F.3d 1273, 1275 (D.C. Cir. 2021), in assessing the Randolph's dangerousness and whether any condition or combination of conditions will reasonably assure the safety of the community if he is released.  The detention decisions following *Munchel* and applying its reasoning have also proven instructive in the Court's analysis.

**1.     Nature and Circumstances of the Offense**

The first factor to consider is the "nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ." 18 U.S.C. § 3142(g)(1).  Randolph is accused of forcibly assaulting a federal officer while she was engaged the performance of her official duties and inflicting injury, which is a "crime of violence" because it "has as an element of the offense the use, attempted use, or threatened use of physical force" against another person. 18 U.S.C. § 3156(a)(4).  The Courts that have addressed the detention or release of defendants alleged to have committed an assault on January 6th have uniformly found that the nature and

7

circumstances of the charged offense weighs in favor of detention. *E.g.*, *United States v. Scott Kevin Fairlamb*, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021) ("Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does."); *United States v. Jack Wade Whitton*, 2021 WL 1546931, at *8 (D.D.C. Apr. 20, 2021) (Defendant's "willingness to seek out an 'organic' weapon, which video evidence shows he used in a chilling assault on MPD officers, speaks to the gravity of the offenses with which he has been charged[.]"); *United States v. Jeffrey Sabol*, 2021 WL 1405945, at *13 (D.D.C. Apr. 14, 2021) ("[T]he Court is convinced that the nature and circumstances of [the defendant's] offenses evince a clear disregard for the law, an aversion to the fundamental tenants of our democracy, and a willingness to act violently when he believes he is 'fighting tyranny,'" where the defendant forcefully took a law enforcement officer's baton, assaulted the officer and separated him from his fellow officers.).

Chief Judge Howell of the D.C. District Court suggested the court develop "the standard against which a particular defendant's actions on that day should be evaluated." *United States v. Chrestman*, ---F. Supp.3d---, 2021 WL 765662, at *7 (D.D.C., Feb. 26, 2021). Chief Judge Howell determined that "several offense characteristics have emerged as guideposts in assessing, under § 3142(g)(1), the comparative culpability of a given defendant in relation to fellow rioters." *Id*. "Those factors include whether a defendant (1) has been charged with felony or misdemeanor offenses; (2) engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) coordinated with other participants before, during, or after the riot; or (5) assumed a formal or informal leadership role in the assault by encouraging other rioters' misconduct; and (6) the nature of the defendant's words and movements during the riot, including whether the defendant damaged federal property, threated or confronted law

8

enforcement, or celebrated efforts to disrupt the certification of the Electoral College vote." *United States v. Pezzola*, 2021 WL 1026125, at *6 (D.D.C. Mar. 16, 2021) (citing *Chrestman*); *accord, e.g.*, *United States v. Klein*, 2021 WL 1377128 (D.D.C. Apr. 12, 2021), *United States v. Jeffrey Sabol*, 2021 WL 1405945 (D.D.C. Apr. 14, 2021), *United States v. Jack Wade Whitton*, 2021 WL 1546931 (D.D.C. Apr. 20, 2021).

Randolph has been charged with felony offenses, so the first factor is indicative of dangerousness. There is no evidence Randolph engaged in prior planning before arriving at the Capitol, carried or used a dangerous weapon during the riot, coordinated with other participants before, during, or after the riot, or assumed a formal leadership role, so the second, third, fourth, and, to some extent, the fifth factor all evince a lower level of danger. Court have disagreed about what behavior constitutes an informal or de facto leadership role during the event, and Randolph's actions on the videos present a close call. On balance, however, the Court finds that Randolph played a de facto leadership role when he physically forced the metal barrier asunder, removing that obstacle for hundreds, if not thousands, of individuals to advance to the Capitol building at that location. *United States v. Chrestman*, ---F.Supp.3d ---, 2021 WL 765662, at *15 (D.D.C. Feb. 26, 2021) ("He not only violated the law himself, but encouraged others to engage in unlawful conduct and made it easier for them to do so by obstructing police barriers[.]"). *But see*, *United States v. Klein*, 2021 WL 1377128, at *8 (D.D.C. Apr. 12, 2021)("The government does assert that Klein engaged in a coordinated effort when he and another unidentified rioter wedged the riot shield between the Capitol doors to enable a third rioter to push open the closing door. But this type of ad hoc, spur-of-the-moment collaboration—while troubling—does not generate nearly the same kind of coordination concerns as other cases. . . . [T]he Court respectfully disagrees . . . that Klein played any real leadership role within the tunnel."). The fact that other rioters may have

9

joined Randolph in shoving over the barrier does make his behavior less culpable, nor does it belie what the video clearly shows: Randolph taking the barrier all the way to the stair handrails and being the first individual to jump over it. The Court candidly admits that there could be fair debate on this point, however, and does not find any de facto leadership role that Randolph played to be determinative in the Court's decision on this § 3142(g) factor.

The sixth *Chrestman* factor—the nature of the defendant's words and movements during the riot—does not account adequately for defendants who perpetrated violence against law enforcement on January 6, 2021. The Court agrees with *Chrestman*'s view that

> "[a] defendant who remained only on the grounds surrounding the Capitol exhibited less brazen disregard for restrictions on unlawful entrants than did a defendant who breached the interior of the Capitol building. The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises. Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement[.]"

*United States v. Chrestman*, 2021 WL 765662, at *8 (D.D.C. Feb. 26, 2021). However, an assault on a federal law enforcement officer inflicting an injury, as alleged here, is not simply "a defendant who injured . . . others" nor is it simply "a defendant [who] actively threatened or confronted federal officials or law enforcement." *Id*. Randolph's 18 US.C. § 111(a)(2) charge is, in fact, the worst of both of these. The sixth *Chrestman* factor weighs strongly in favor of a finding that the nature and circumstances of the offense require danger-based detention.

One month after the *Chrestman* decision, the D.C. Circuit Court weighed in on the detention or release of Capitol insurrectionist defendants. In *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), the D.C. Circuit neither explicitly adopted nor rejected the *Chrestman* approach. The *Munchel* decision echoed some of the *Chrestman* factors in instructing trial courts that where the evidence shows the defendant "assaulted no one on January 6; that they did not

enter the Capitol by force; and that they vandalized no property are all factors that weigh against a finding that either pose a threat of 'using force to promote [their] political ends[.]'" *Munchel* at 1283. However, the *Munchel* Court placed far more emphasis on the level of violence a defendant exhibited than the *Chrestman* court, holding that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id*. at 1284. "In so holding, *Munchel* drew categorical distinctions between the violent and non-violent January 6 participants explaining that the former are categorically more dangerous." *United States v. Scott Kevin Fairlamb*, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).

Thus, in light of *Munchel* and the specific assault allegations against Randolph, this Court finds the factors enumerated in *Chrestman* do not fully account for those who committed crimes of violence on January 6th. Congress set aside crimes of violence as requiring specific consideration in making a detention or release decision. *See* 18 U.S.C. § 3142(g) ("The judicial officer shall . . . take into account the available information concerning—(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ."). Additionally, the undersigned is concerned with *Chrestman*'s comparisons between hundreds of unique defendants to determine their "comparative culpability." *Chrestman* at *7. "The Bail Reform Act does not call for consideration of potential disparities between defendants. Instead, it calls for close analysis of the relevant factors and evidence in an individual case." *United States v. Scott Kevin Fairlamb*, 2021 WL 1614821, at *8 (D.D.C., Apr. 26, 2021). While *Chrestman* provides practical "guideposts," to the extent it suggests a framework inconsistent with the Bail Reform Act or the *Munchel* decision, the Court does not wholly rely on it.

11

Regardless, the Court concludes that pursuant to the analysis in **both** *Chrestman* and *Munchel*, the egregious nature and circumstances of the specific allegations against Randolph demonstrate dangerousness that weighs in favor of detention.

### 2. Weight of the Evidence

The second factor concerns the "weight of the evidence against the person." 18 U.S.C. § 3142(g)(2). In the Sixth Circuit, "[t]his factor goes to the weight of evidence of dangerousness, not the weight of the evidence of defendant's guilt." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Although this represents the minority approach to the second factor in the § 3142(g) analysis, and it is the law by which the Court is bound in Sixth Circuit cases. *See United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010).

This case, however, is not going forward in the Sixth Circuit. "Without question, the [Bail Reform] Act recognizes a 'local' interest in the originating jurisdiction which may be different than the interests of the jurisdiction in which the arrest occurs." *United States v. Jones*, 804 F. Supp. 1081, 1090 (S.D. Ind. 1992). Some of the "factors in section 3142(g), such as the nature and circumstances of the offense charged and the weight of evidence against the defendant, that are more easily weighed in the charging district." *United States v. Vega*, 438 F.3d 801, 803–04 (7th Cir. 2006). This Order, if appealed, will be reviewed by a district judge in the district court for the District of Columbia, which follows the majority approach to the second 3142(g) factor. Thus, the Court finds it appropriate in this situation to also analyze this factor under the majority approach in accordance with the law of the D.C. District Court. Namely, the Court does weigh the evidence of the defendant's guilt. "If the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

12

Here, like many similar prosecutions that have resulted from the Capitol insurgency, "[v]ideo evidence depicts all of the conduct for which [Randolph is charged]. The defendant's assault on [the Victim Officer] appears on video. He cannot reasonably dispute that it occurred. The weight of the evidence against the defendant strongly supports detention." *United States v. Scott Kevin Fairlamb*, 2021 WL 1614821, at *7 (D.D.C. Apr. 26, 2021).

### 3. Randolph's History and Characteristics

The third factor, the "history and characteristics of the person," considers "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings[.]" 18 U.S.C. § 3142(g)(3). Randolph has minimal criminal history, consisting primarily of traffic offenses and minor misdemeanor drug and alcohol charges. Pertinent to the Court's analysis, however, is Randolph's conviction in 2011 for resisting arrest. [Pretrial Services Report at Page 4]. A ten-year-old misdemeanor conviction is not probative of Randolph's entire history and characteristics nor convincingly indicative of his predicted future behavior; however, it is some evidence that Randolph engaged in an altercation with or in disregard for the directives of law enforcement in the past.

Randolph has no known history of substance use disorder (though he does use cannabis occasionally), mental illness, or violence. He was employed at the time of his arrest and may be able to return to that position. Three witnesses testified on his behalf about his good character, including his devotion to his girlfriend's elderly grandmother, whom he cared for nearly full-time until her recent passing. There is no evidence, unlike other cases related to the events of January 6, 2021, that Randolph is or has ever been a member of a violent or extremist group. The United States conceded that there is little known information, positive or negative, about Randolph's

13

history. The Court cannot find that Randolph's history and characteristics lean towards detention solely based on his actions on January 6th. To do so would be to render this § 3142(g) factor meaningless, as Randolph's offense conduct, the evidence against him, and his dangerousness are already considered in the other three factors. Thus, the Court finds this factor weighs in favor of release.

### 4. Nature and Seriousness of the Danger Posed by Randolph's Release

The final factor to consider is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). This factor is, by a large margin, the most difficult to assess in this case. It is also ultimately determinative in the Court's decision to detain Randolph. As the D.C. Circuit stated in *Munchel*:

> The crux of the constitutional justification for preventive detention under the Bail Reform Act is that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat." Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to "non-physical harms such as corrupting a union." But it must be clearly identified.

991 F.3d at 1282–83 (citations omitted).

Randolph vehemently argued that he does not pose any threat to another or the community, much less an "identified and articulable threat." Randolph proffered that he was "swept up" and "caught up" in the insurrection on January 6, 2021, with the large crowd that had assembled that day. He proposed several conditions to mitigate any possible risk of danger, including GPS monitoring, home detention, and restrictions on political activities during the pendency of this case. "The threat [a defendant poses if released] must also be considered in context." *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021). The Court considers the extremely unique circumstances of January 6, 2021, and finds the conditions Randolph proposed would

14

mitigate, if not nearly eliminate, the *one very specific risk* that he could engage in dangerous criminal behavior during another political-rally-turned-violent-insurrectionist-mob on the United States Capitol grounds.

But the Bail Reform Act does not limit the Court to assessing whether the defendant poses a risk of repeating *identical* behavior; rather, the Bail Reform Act requires the Court to "take into account the available information concerning [. . .] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Randolph urged the Court to consider that the incident captured on the videos was an aberration of character, suggesting a man "swept up" in a moment. The Court, however, rejects Randolph's argument as a disingenuous attempt to deflect responsibility for his own choices. Randolph *chose* to drive from Kentucky to Washington, D.C., ostensibly to hear President Trump speak at the "Stop the Steal" rally. Randolph then *chose* to leave the rally early to march towards the United States Capitol building. Upon encountering metal barriers and signs declaring "Area Closed," Randolph *chose* to advance to the very front of the crowd and press himself against the barriers. Randolph *chose* to shake the barriers. Randolph *chose* to struggle over the barrier with the Victim Officer. Randolph *chose* to ignore the Victim Officer's verbal demands that he stop. Randolph *chose* to shove, aggressively, the barrier against the Victim Officer until he overpowered her, knocked her to the ground, and rendered her unconscious. Randolph, seeing the Victim Officer's head "bounce[] off the handrails" and believing her to have suffered a concussion because she was "curled up in the fetal position," was undeterred. While some of his fellow protesters rendered assistance to the Victim Officer, Randolph *chose* to ignore the unconscious Victim Officer at his feet. He then *chose* to jump over the barrier and violently engage two additional Capitol police officers. Randolph *chose* to fight with them despite knowing he had just injured the Victim

Officer, and with what appears to be no regard for the risk that he could injure someone else if he continued his violence or for the risk that his actions could inspire others to mimic his unconscionable acts. And finally, ***ninety-seven days later***, when there he was no longer "swept up" in the events of January 6, 2021, but had the clarity of hindsight, Randolph *chose* to describe the events of the day—which included assaulting and injuring a law enforcement officer—as "fucking fun."

There is no evidence that Randolph engaged in violence before or after January 6, 2021. But again, the Bail Reform Act does not require that a defendant has engaged in a certain number of assaults, or any other crime, to find that he poses a danger to the community if released. Randolph's actions as viewed on the videos from that day show a man who is capable of assaulting law enforcement, injuring an officer, and going back for more "fucking fun" by fighting with two more officers. The Court rejects Randolph's proffer that his assault of the victim officer was not "intentional," but rather just "a rally that got out of hand." [DE 6, Recording at 1:49:16-50:20]. The Court has watched the Instagram and YouTube videos numerous times to understand and assess the events that occurred. Nothing Randolph did on those videos appears inadvertent or accidental. Randolph made choices.

Despite Randolph's pleas to the contrary, the Court accords Randolph no "credit for not being even more violent" because he did not punch the Victim Officer or hit someone over the head with a poll like some other rioters did. *United States v. Scott Kevin Fairlamb*, 2021 WL 1614821, at *8 (D.D.C. Apr. 26, 2021). Randolph's suggestion that he is not dangerous because he could have engaged in a *worse* assault, or additional assaults, but chose not to, is absurd.

Randolph attempted to blunt his statement that the seditious riot was "fucking fun" with the testimony of Agent Jones. Agent Jones testified that Randolph told the undercover FBI agents

16

"he had witnessed a lady officer who had . . . essentially gotten trampled by a barricade" and "he thought that she [Victim Officer] most definitely probably had a concussion, and that he was concerned for her." [DE 6, Recording at 21:28-33]. Although the Court is heartened to hear, in light of Randolph's other words and actions, that he expressed a brief moment of concern (albeit three months later) for the Victim Officer, this statement does not surmount the totality of the other circumstances the Court has described herein and viewed on the videos.[5]

Randolph's description of his involvement in a violent, insurrectionist mob and his assault on the Victim Officer as "fucking fun" evinces a profound disregard for the rule of law and safety of his fellow person. The "identified and articulable threat" that Randolph poses to the community is his apparent willingness to perpetrate violence against law enforcement. *Munchel* at 1282–83 (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987)). The D.C. Circuit Court recognized that "those who *actually assaulted police officers* and *broke through* windows, doors, and *barricades*, [. . .] are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, at 1284 (emphasis added).

The Court cannot conclude that an individual who, after three months of reflection, brags to a stranger about the behavior he exhibited on the YouTube and Instagram videos, does not pose a serious danger to the community. Further, the Court cannot mitigate this risk with release conditions. What condition or combination of conditions will reasonably assure the safety of the community where the defendant openly, brazenly, and ruthlessly assaults law enforcement in front of numerous video cameras on the steps of democracy and gloats about it later? The Court finds there are none. *See United States v. Chansley*, 2021 WL 861079, at *8 (D.D.C., March 8, 2021)

---

[5] Further, Randolph's passive-voice description of the assault to individuals he did not know were law enforcement is a disingenuous revision of the events displayed on the videos and calls into question his willingness to accept the reality of what occurred.

17

("[D]efendant's conduct on and after January 6th indicates his willingness to resort to violence to undermine the legitimate functions of the United States government. Furthermore, defendant's refusal to obey orders from law enforcement while inside the Capitol building indicates that he would not comply with conditions of release imposed to keep the public safe.").

## CONCLUSION

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This is a close case when the Court considers Randolph's history and characteristics, and the Court does not take the pretrial deprivation of his liberty lightly.

For the stated reasons, United States failed in proving that Randolph poses a risk of obstruction justice, failed in proving that he is an irremediable flight risk based on facts supported by a preponderance of the evidence, but succeeded in proving Randolph is an irremediable danger risk based on facts supported by clear and convincing evidence. The Court has assessed the record, contemplated the risks, evaluated conditions, and determined that there exist no conditions that can reasonably assure Randolph will not pose a danger to another or the community. Accordingly, the Bail Reform Act mandates detention. The United States' oral motion for pretrial detention is **GRANTED**.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Entered this the 30th day of April, 2021.



Signed By:
Matthew A. Stinnett  MAS
United States Magistrate Judge